## JACKSON IRON CO. v. NEGAUNEE CONCENTRATING CO.

### (Circuit Court of Appeals, Sixth Circuit. January 8, 1895.)

### No. 125.

1. CONTRACTS—NOVATION.

The J. Iron Co., in 1881, made a contract with the U. Co., by which the former agreed to sell and the latter to buy, for reduction by a concentrating process, certain iron ores of two different kinds, produced by the J. Iron Co., at prices fixed in the contract. It was provided that the price of the ore to be taken and paid for by the U. Co. at the prices fixed should amount to at least $2,500 per year, payable in equal monthly installments, or the contract might be forfeited. Lands were to be leased by the J. Iron Co. to the U. Co., if desired by it, for the purpose of erecting mills and machinery, at a nominal rent of $1 per year. The contract contained various stipulations as to the way in which it should be carried out, and provided that the U. Co. might assign it, or any share of or interest in it. Immediately after the making of the contract, the U. Co. sold to the N. Co. the right to take and use one of the kinds of ore referred to, the N. Co. agreeing to take and use only a certain limited amount of ore, to pay the U. Co. a certain amount of stock for the privilege, and to pay to it, or at the N. Co.'s option, to the J. Iron Co., the price stipulated in the first contract for the ore taken and used by it. The N. Co. also agreed not to suffer or permit any violation of or default in the first contract, so far as its operations were concerned, and to perform the same, so far as its operations should make it necessary or proper so to do. The N. Co. entered upon the performance of this contract, took and used ore, and paid the $2,500 per year, in monthly installments, to the J. Iron Co., until November, 1883, when it ceased its operations and stopped payment. The U. Co. never did anything under its contract. The J. Iron Co. afterwards sued the N. Co. for payments due, under the agreement in the first contract to pay it $2,500 per year, claiming that the N. Co. had been substituted in place of the U. Co. Held, that there was no novation whereby the U. Co. was absolved from its obligation, or the N. Co. substituted in its place.

2. SAME—CONTRACT FOR THE BENEFIT OF THIRD PARTY.

Held, further, that as the N. Co. contracted only to pay the price of the ore taken by it to the U. Co., or, at its own option, to the J. Iron Co., there was no contract for the benefit of the J. Iron Co. upon which it could sue.

3. SAME—STATUTE OF FRAUDS — CONTRACT NOT TO BE PERFORMED WITHIN A YEAR

The J. Iron Co. also alleged that the N. Co. had specially agreed with it, in consideration of its forbearance to enforce immediate payment or forfeit the contract, to make the annual payment of $2,500 stipulated in the original contract. The only evidence to support this allegation was of an oral declaration by an officer of the N. Co. The contract was, by its terms, to continue 16 years. Held that, if any contract arose from such oral statements, it was within the statute of frauds of Michigan, requiring a written memorandum of any contract not to be performed within a year.

4. SAME—LANDLORD AND TENANT.

Held, further, that no obligation to pay the $2,500 could be established on the ground of a privity of estate between the J. Iron Co. and the N. Co. as landlord and tenant, since this stipulated payment was the price of ore to be taken, and not rent, which was provided for only by the nominal sum of one dollar, named in the contract.

In Error to the Circuit Court of the United States for the Northern Division of the Western District of Michigan.

This was an action by the Jackson Iron Company against the Negaunee Concentrating Company to recover installments of money claimed to be due upon a contract.

The action below was begun in the circuit court for the county of Marquette, Mich., and was duly removed to the court below on the ground of diverse citizenship. The controversy in this case arose out of two contracts. The first was made on the 14th day of November, 1881, between the Jackson Iron Company, a corporation organized and existing under the laws of the state of Michigan, and the Union Ore Concentrator Company, a joint-stock association organized under the laws of the state of New York. By the terms of said contract, the Jackson Iron Company agreed to sell to the Union Ore Concentrator Company, and the latter agreed to buy from the former, its entire stock piles of refuse low grade ores then accumulated and thereafter to accumulate at its mines in the state of Michigan, which should contain not less than 25 per cent. of concentrated ore, to be used in the works of the vendee company, its assignees or licensees; the price of the finished concentrated product to be, to wit, 45 cents per ton of such concentrated product of all hard or specular ores worked from the Jackson mine, and 35 cents per ton of such concentrated product of all hematite or soft ores worked from the south side mine, payable in cash on the 15th of each month for all ores removed or worked the previous month, the title to such ores to remain in the vendor until payment should be made. The said sale and purchase was to include all the above-described refuse product of said mines already accumulated and thereafter to be accumulated during the 16 years next succeeding September 1, 1882, which should contain 25 per cent. or more per ton of concentrated ore, and the Union Ore Concentrator Company was given the right to commence operations on said refuse piles before September 1, 1882, if it should be in readiness therefor. The ores were to be handled so as not to inconvenience the operations of the Jackson Iron Company, and subject to its approval; and the latter agreed to give the vendee all reasonable facilities for sorting, concentrating, and loading the said ore. The vendee company agreed that all the ore now in the stock piles and sold under the contract should be removed within 16 years from the date named, and, should it fail in any one year from the last-mentioned date to remove as much as 10,000 tons, or to pay to the Jackson Iron Company the sum of $2,500 annually, payable in equal monthly installments on the purchase price, then said contract, at the option of the Jackson Iron Company, might terminate. But said provision for monthly instead of annual payments was to be regulated in such manner as not to destroy the spirit of the contract, and no default was to be taken without a request for payment, and neglect or refusal to comply therewith. It was further mutually agreed that, in case the Union Ore Concentrator Company should pay during any one year in the aggregate the sum of $2,500, without having removed sufficient ore to amount to that sum, the surplus should be credited on future deliveries. The Jackson Iron Company also agreed to sell to the Union Ore Concentrator Company, and the latter agreed to buy, any and all of the same class of ores described that could not be profitably shipped or sold for smelting, and all that the vendor company, its successors or assigns, might mine in said mine during the 16 years described, at the same prices, and on the same conditions as before stated. It was further provided that nothing in the contract should be construed to operate to oblige the Jackson Iron Company to deliver or mine any specific amount of ores, or to prevent it from removing the ores, or any part thereof, to any other point or points which might be reasonably convenient for the Union Ore Concentrator Company, should the safety of the mine or mines or the convenience of the vendor company require it; nor was it to be obliged to raise from its mine or mines and deliver to the vendee company any of said refuse ores that it might wish to leave in said mines or use for other purposes than for sale or smelting. And, as the vendee company proposed not only to concentrate ores from said refuse low grade ores, but also to mine ores of the same class

on the same premises, the vendor company granted to it the right to do so within certain reasonable limits for its production. And therefore the vendee company was to be allowed to blast down and mine mixed ores of the quality described for concentrating from any suitable place on its said property, but not in any way to interfere with the operations of the vendor company; the latter to be the sole judge of the .convenience and expediency of granting such leave to mine ores. The ores thus mined were to be considered the same as if they belonged to the stock piles of refuse low grade ores, and the vendee company was to pay therefor in the same manner before provided for ores to be taken from said piles. When the vendee company, in its process of excavating and removing the inferior class of ores should open or expose ores suitable for shipment or smelting, the vendor company was to be notified, and all operations at that point were to cease as soon as .directed by the vendor company. In case the vendor company considered the process for removing ores to be dangerous or damaging to its property, the vendee company was to cease such operations on receiving written notice from the vendor. Should the vendee company desire to use steam power for its concentrating operations suitable for mills and machinery for carrying on operations under the contract, lands were to be leased by the vendor company to the Union Company or assigns at a nominal rent of one dollar per annum. The Jackson Iron Company agreed that the vendee company might assign said contract, or any share thereof, or interest in or under the same, to the Marquette Concentrating Company, or to such other corporations, companies, or associations as it might see fit, but solely for mining and concentrating ore as herein provided. Subsequent to the making of said contract of November 14, 1881, the Union Ore Concentrator Company, on the 7th of January, 1882, entered into a contract with the Negaunee Concentrating Company, a corporation organized under the laws of Michigan, whereby the first-named company sold to the defendant in this case certain rights under the first-named contract to take, separate, refine, and sell out of and from the hard or specular ores mentioned and described in the first contract, either by mining the same under said contract, or out of and from the refuse or waste piles therein mentioned, so much of said ores sufficient at all times to supply and keep in full operation all mills and machinery which should be erected by the defendant company for the purpose of refining and separating said ore, provided that the same should never exceed 1,000 tons per day of refined or separated ore, and that the defendant company should have no right to mine, take, or use of said ores any more than would be sufficient to keep its mills and machinery to be erected in full operation, nor more, under any circumstances, than sufficient to produce and yield 1,000 tons of separate or refined ore; and the Union Ore Concentrator Company further sold to the defendant company the full and ample right and authority to use all patents and patented machinery now owned by the said vendor company which should be needful or required by the defendant company for the purpose of refining or separating said ores, not to exceed the quantity it can separate or refine, nor to exceed 1,000 tons per day of refined or separated ore. And the Negaunee Concentrating Company agreed to pay to the vendor company for the rights and privileges conveyed in said contract the sum of $225,000 in and by the issuing and delivery of that amount at par value of certificates of its capital stock, and further agreed to pay to said vendor company, or, at its own election, to the Jackson Iron Company, 45 cents per ton for each and every ton of concentrated ore made, refined, separated, or produced by it; payable in cash on the 15th of each month for all such product of the previous month. All the acts and doings of the vendee company under said contract were to be in strict compliance with all the terms of said written agreement of November 14, 1881, with the Jackson Iron Company. The vendee company was not to be guilty of any violation of said agreement, nor suffer or permit, so far as it or its operations were concerned, any default therein or violation thereof; and it agreed to perform the same on its part so far as it or its operations should make it necessary or proper so to do. The vendee company further agreed not unnecessarily to interfere with the business operations of the vendor company or its assigns; that neither party should have the right to oust the

other, or to occupy any part of the premises mentioned in said agreement upon which the other should have erected any mills, or which should be in active use by said party. It was further expressly understood that the vendee company was not to interfere with or in any way obstruct the vendor company or its assigns in mining or obtaining its or their full supply of ores as specified in its contract with the Jackson Iron Company, dated November 14, 1881, or in using any road or tramways or any rights of ingress or egress to said ores owned or occupied by the defendant company. But the vendor, its assigns or successors, whenever wishing to use said roads or tramways, was to pay one-half the cost of construction.

On the 5th of July, 1889, the Jackson Iron Company filed its declaration in the circuit court for the county of Marquette, Mich., against the Negaunee Concentrating Company, setting forth the terms of the contract of November 14, 1881, between the Jackson Iron Company and the Union Ore Concentrator Company, but averring that said last-named company never entered upon the plaintiff's lands, or took or paid for any of said ores, or built or erected any mills for concentrating ore, or performed any other act or thing to carry out its agreements or the purposes of its organization; but, on the 7th of January, 1882, and between that date and the 1st day of March next thereafter, transferred expressly certain of its rights, and in effect all its rights, to the Negaunee Concentrating Company, the defendant in said suit, and placed said defendant in possession of the premises of the plaintiffs selected by said defendant for the erection of the mills and carrying on of the business described in said contract, and required the defendant to permit or suffer no violation of the covenants and agreements of the said Union Ore Concentrator Company with the plaintiff, to permit no default therein on the part of the said Union Ore Concentrator Company, and to perform the obligations of said last-named company thereunder; that thereafter the defendant built mills on the plaintiff's lands, demanded and received from it all the rights and privileges granted by the plaintiff to the said Union Ore Concentrator Company, and received from the plaintiff, under the terms of said contract, and in all respects assumed, exercised, and received all the property rights granted to the said Union Ore Concentrator Company under said contract, and assumed and discharged all the covenants and obligations to the plaintiff imposed upon and entered into by the said Union Ore Concentrator Company until the default hereinafter mentioned, and accounted to the plaintiff in all things as contracting party, whereby the defendant became bound and liable to the plaintiff, according to the terms of said contract, to take and pay for all said stock piles of accumulated ore during said period of 16 years, and to pay to plaintiff therefor at the rate, at the times, and in the manner aforesaid, and thereby promised, undertook, and agreed with the plaintiff so to do, and, among other things, became bound to, and then and there promised, to pay to the plaintiff the minimum sum of $2,500 per year, in monthly installments of $208.33, for each and every year of said period up to the close thereof; but that on the 15th of November, 1883, defendant made default therein, and thence hitherto has disregarded its said promises and obligations, and has failed to make such payments, to the plaintiff's damage in the sum of $15,000. The declaration then continues with a second count, alleging the terms and conditions of the contract of November 14, 1881, substantially as set forth in the first count, and then sets forth the terms and provisions of the second contract, of January 7, 1882, between the Union Ore Concentrator Company and the Negaunee Concentrating Company, and then, alleging that the defendant under its contract covenanted with the Union Ore Concentrator Company to permit no default by which the contract could be forfeited, upon which the payment to the plaintiff of the $208.33 monthly, or the removal of and payment for 10,000 tons yearly, became an obligation of the defendant, averred that by such covenant the defendant became obligated to plaintiff, and made a new contract or promise to pay in consideration of a forbearance by plaintiff to sue this defendant or claim immediate payment from it, and a further forbearance for defendant's benefit to terminate the contract; that the promise thus made was not only to pay an obligation of defendant, but to obtain additional special benefits to itself. The evidence disclosed that the defendant, the

Negaunee Concentrating Company, had gone upon the lands of the plaintiff. the Jackson Iron Company, had erected mills and machinery, and had taken out ore from 1882 until 1886; that up to that time the defendant had paid the plaintiff everything due under either contract, but that thereafter no ore was taken out, and no money was paid. A watchman remained in the mill, and looked after the machinery, until about the time this suit was begun, in April, 1889, when the defendant took away the machinery, and abandoned the mill.

George Hayden, for plaintiff in error.

Ball & Hanscom, for defendant in error.

Before TAFT and LURTON, Circuit Judges, and RICKS, District Judge.

RICKS, District Judge, having stated the case as above, delivered the opinion of the court.

The plaintiff, in the first count of its declaration, proceeds upon the claim of a novation, and the trial judge in the circuit court, so construing it, held that neither by the second contract nor by what transpired between the parties under it was there a novation whereby the Union Ore Concentrator Company was absolved from its liability to the Jackson Iron Company under the original contract. This conclusion is well warranted from the terms of the contracts. The new contract did not take the place of or satisfy the old contract. The chief difference between them was that the defendant had no right to mine soft ores while the Union Company had that right and retained it. Both could have occupied land of the Jackson Iron Company and conducted operations under the two contracts. Under the contract between the Union Ore Concentrator Company and the Negaunee Concentrating Company, therefore, the former made a partial assignment of its rights under the first contract between it and the plaintiff. The plaintiff was in no sense a party to the second contract. The second contract was a partial transfer of rights and a division of the obligations of the Union Company between it and defendant, but without any new and distinct agreement on the part of the plaintiff confirming or permitting a novation. It is true, as contended, that the defendant under the last contract did pay the amount of the monthly installments in pursuance of its contract with the Union Company, and that it did that to prevent default and forfeiture by the Union Company, and to protect itself; but it cannot be inferred from that fact that the plaintiff and defendant entered into a contract by which the defendant assumed and agreed to pay the sum of $2,500 per annum, and for which consideration the plaintiff absolved the Union Company from the obligations of the first contract, and accepted the defendant as the obligee under that contract. We therefore fully concur with the trial judge that there was no novation to support the first count of the declaration.

Next it is said that the written agreement between the Union Company and the defendant company amounted to a promise on the part of the defendant company to pay the amount stipulated in the contract between the plaintiff and the Union Company to the

plaintiff, and that this, therefore, became a contract for the benefit of the plaintiff, upon which the plaintiff might sue the defendant, on the principle of National Bank v. Grand Lodge, 98 U. S. 123; Hendrick v. Lindsay, 93 U. S. 143, and other cases. This brings us to consider what the obligation of the defendant company was in respect of the payment of the $2,500 per year in monthly installments. The obligation, if it existed, arose in this wise: Its contract with the Union Company provided that the defendant should pay to the Union Company, or, at its own election, to the plaintiff, the Jackson Iron Company, 45 cents per ton for each and every ton of concentrated ore made, refined, separated, and produced by it, payable in cash on the 15th of each month for all such concentrated product for the previous month. The same contract provided that the defendant should not occasion or be guilty of any violation of the contract between the Union Company and the plaintiff, or suffer or permit, so far as its operations were concerned, any default therein or violation thereof, and that it would perform the same on the part and behalf of the said Union Company so far as it or its operation should make it proper so to do. The contract between the plaintiff and the Union Company provided, in effect, that the minimum payment by the Union Company each month on account of ore sold to the latter should be $208.33, or $2,500 per year, on failure to pay which the plaintiff might terminate the contract; and that, if the ore, actually taken by the Union Company in any month or year, did not equal in its contract price the minimum payment above required, the surplus should be credited on future deliveries. If the defendant became liable at all to pay the $2,500 a year as minimum royalty or purchase price of ore, it was by reason of its stipulation to perform the contract of the Union Company so far as its operation would make it proper to do so, taken in connection with its agreement to pay 45 cents a ton for ore taken by it. As the $2,500 was to be treated as a payment of the purchase price of ore taken or to be taken, and as in paying for the ore taken by it the defendant had the option to pay either the Union Company or the plaintiff, as it might elect, there was no absolute agreement by the defendant in its contract with the Union Company to pay the plaintiff this $2,500. It would fully comply with its contract by paying this sum to the Union Company. The necessary result is that no right of action to enforce such payment could accrue in favor of the plaintiff from the contract between the defendant and the Union Company.

The second count of the declaration proceeds on the theory of an independent promise made directly by the plaintiff to the defendant to pay the $2,500 per year in monthly installments mentioned in the contract between the Jackson Company and the Union Company in consideration of the forbearance by the plaintiff to terminate that contract, and thus to prevent the defendant from enjoying so much of the rights conferred by that contract as were assigned to it by the Union Company. The averment in the count is that the defendant has repeatedly promised to pay the amount due under the con-

tract, and has induced the plaintiff to rely thereon, and has by means thereof maintained possession of the plaintiff's premises, and has kept in force this contract. The evidence offered to support this count consisted of the oral declaration of the superintendent of the defendant company to an officer of the plaintiff company, that the defendant "would pay up as it had been doing; that the company had no funds to pay with until they could effect some changes in their stockholders, and perfected some machinery they wanted to put in place of old machinery that didn't work well; that the company intended to go on and fulfill its contract, and proposed to hold the land, and they would be greatly favored if the Jackson Company would wait on them, and not press for payment." The plaintiff company did not, as it had the right to do by reason of the default of the Union Company, terminate the contract. We are of opinion that if any contract can be said to have arisen from the conversation above stated, it was within the statute of frauds of Michigan, which renders unenforceable every agreement not in writing that by its terms is not to be performed within one year from the making thereof. How. Ann. St. § 6185. Giving the evidence the construction most favorable for the plaintiff, the contract was an agreement by the defendant to pay during the life of the contract at least $2,500 a year for the privilege of taking the iron ore and using it, in consideration of the plaintiff's agreement to forbear to forfeit the rights of the Union Company under the contract, and thereby to prevent the defendant company from continuing its operation under its contract with the Union Company. This was certainly an agreement on the part of the defendant to do something which, by its terms, could not be performed within a year, for both contracts had at least 10 years to run. Even if it can be said that the plaintiff could and did fully perform within a year on its part that which formed the consideration of the defendants promise, namely, the forbearance to terminate the contract for a reasonable time, this was not, in Michigan, such a part performance as would take the case out of the statute of frauds. Whipple v. Parker, 29 Mich. 369; Perkins v. Clay, 54 N. H. 518; Emery v. Smith, 46 N. H. 151; Frary v. Sterling, 99 Mass. 461; Reinheimer v. Carter, 31 Ohio St. 579; Pierce v. Payne's Estate, 28 Vt. 34; Lockwood v. Barnes, 3 Hill, 128; Broadwell v. Getman, 2 Denio, 87; 1 Smith, Lead. Cas. 45, etc.; Brown, St. Frauds, § 286. It fully appears, and was conceded by counsel in the court below, that after the alleged promise upon which the second count is based the defendant company took out no more ore, and therefore no recovery could be had against it in assumpsit as upon a quantum valebant.

The next claim of the plaintiff is that the defendant was in privity with the plaintiff as a tenant, and as such was directly liable to plaintiff to pay and discharge all the obligations necessary to maintain such leasehold interests. It appears that, while the defendant took no ore from the plaintiff's ore pile after the time up to which it had paid in full the monthly payment of $208.33 as minimum royalty or price for ore, its mill stood on plaintiff's ground, and its ma-

chinery lay there, in charge of a watchman, till just before the bringing of this suit. The land which was occupied by the defendant was rented by the Jackson Iron Company to the Union Company at a nominal rent of $1 per annum, and, even if there was privity established between plaintiff and defendant by defendant's continued occupancy of this land, it would not involve the payment by the defendant of more than that rent, and would certainly not create the liability sought here to be established on the agreement of the Union Company to pay $2,500 to the Jackson Company as a minimum payment of royalty or purchase price of the ore to be sold under the contract. The $2,500 was not to be paid as rent, and cannot be recovered against defendant as such, on any theory of privity of estate. The judgment of the circuit court is affirmed.